555 F.2d 1379
 1977-1 Trade Cases 61,520
 MEMOREX CORPORATION, MRX Sales and Service Corporation, ILC
Peripherals Leasing Corporation, and Memorex, A.B.
(Sweden), et al., Plaintiffs-Appellees,
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant-Appellant.
 Nos. 76-1887, 76-1898.
 United States Court of Appeals,
Ninth Circuit.
 June 20, 1977.
 
 Karl A. Limbach, San Francisco, Cal., John L. Endicott, argued, Los Angeles, Cal., Limbach, Limbach & Sutton, San Francisco, Cal., for defendant-appellant.
 Patrick Lynch, argued, O'Melveny & Myers, Los Angeles, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before WATERMAN, CARTER and KENNEDY, Circuit Judges.
 JAMES M. CARTER, Circuit Judge:
 
 
 1
 This is an interlocutory appeal in a private antitrust action for damages and injunctive relief under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Defendant International Business Machines Corporation ("IBM") appeals from an order granting the motion of plaintiffs Memorex Corporation and several affiliates ("Memorex") to strike an affirmative defense. The essence of the stricken defense is that Memorex maintained an "unlawful market presence" as one of IBM's competitors and thus could not have sustained any "injury" cognizable under § 4 of the Clayton Act. We affirm.
 
 Facts
 
 2
 In the early 1960's, IBM undertook an extensive research and development program to design new electronic data processing products. Among these products were disk storage devices for recording information for use in computers. Some of IBM's competitors in the electronic data processing field responded to these new products by developing alternatives to the IBM line. Others manufactured copies of the IBM equipment.
 
 
 3
 Memorex was founded in 1961 and within five years became the largest producer of magnetic recording tapes. In 1967, Memorex expanded into the market for disk storage devices. IBM claims that the only product "development" by Memorex consisted of the systematic theft of IBM trade secrets. Memorex did lure key IBM personnel away and used the information they had.[1] IBM and Memorex also entered into several patent cross-licensing agreements during this period.
 
 
 4
 Memorex's share of the market in disk storage devices increased while IBM's decreased. Finally, IBM filed an action against Memorex in the California Superior Court in December 1970.[2] IBM alleged in its complaint that Memorex had wrongfully appropriated many of its trade secrets and other confidential information. An injunction was sought to restrain Memorex from these alleged acts of misappropriation. After almost a year of discovery, the case was settled. The settlement agreement called for Memorex to stop marketing certain products and to limit its hiring of IBM personnel. In return, IBM dismissed its complaint with prejudice.
 
 
 5
 Memorex brought this action in December 1973. Memorex alleges that IBM has committed numerous anti-competitive acts against it in order to perpetuate its purported monopoly. IBM's answer included the "unlawful market presence" defense. The district court granted Memorex's motion to strike this defense on the ground that such defenses are not recognized in private antitrust litigation. This issue was certified by the district court for interlocutory appeal under 28 U.S.C. § 1292(b).
 
 Nature of the Defense
 Section 4 of the Clayton Act provides:
 
 6
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold damages by him sustained, and the cost of suit, including a reasonable attorney's fee."IBM argues that Memorex cannot satisfy the requirement of a business of its own because the property it sold was stolen. Memorex's market presence was a result of this illegal activity, IBM contends, and thus Memorex could not be injured within the meaning of § 4.
 
 
 7
 IBM attempts to distinguish its defense of "unlawful market presence" from the traditional equitable defenses of "unclean hands" and in pari delicto. "Unclean hands" is said to show that the plaintiff is in some way morally reprehensible with respect to the subject matter of the action. The plaintiff therefore is not permitted to recover despite the wrongfulness of the defendant's action. "Unclean hands" has not been recognized as a defense to an antitrust action for many years. See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219 (1951).
 
 
 8
 In pari delicto also is a common law defense. It asserts that a plaintiff who participated in the wrongdoing cannot recover when he suffers injury as a result of that wrongdoing. As held in Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968), "the doctrine of in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action."
 
 
 9
 IBM maintains that "unclean hands" and in pari delicto are different from the defense of "unlawful market presence." The latter defense is said to establish the absence of injury altogether. We agree that each defense will be based on a different factual pattern. However, illegality on the part of the plaintiff is the common nucleus of all of these defenses.
 
 The Calnetics Decision
 
 10
 The district court held that this court's decision in Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674 (9 Cir. 1976), controlled. In that case, the plaintiff, Calnetics, was a manufacturer of automobile air-conditioners who had entered into a secret agreement by which Volkswagen distributors received kickbacks for placing its air-conditioner units in their cars. The agreement allegedly violated §§ 1 and 2 of the Sherman Act, § 2(c) of the Robinson-Patman Act, and California state law. Eventually a Volkswagen subsidiary entered into an allegedly illegal conspiracy with these same distributors, displacing Calnetics from the market.
 
 
 11
 Calnetics sued Volkswagen. It alleged, inter alia, that Volkswagen had combined with its distributors to restrain competition in the manufacture and sale of air conditioners, in violation of § 1 of the Sherman Act. The district court granted summary judgment against Calnetics on this count because of its own illegal activity. Calnetics Corp. v. Volkswagen of America, Inc., 348 F.Supp. 623 (C.D.Cal.1972).
 
 This court reversed. It said:
 
 12
 "The district court committed both a factual and legal error in granting this partial summary judgment. As noted, a genuine issue of material fact exists as to the cause-and-effect relationship between the . . . commission agreement and Calnetics' sales to (d)istributor(s) during the 1969 model year. More important, the district court erred in ruling that because the 1969 sales resulted from an unlawful agreement they could not be admitted in evidence as a basis for calculating Calnetics' damages. Admissibility is one thing: weight and probative value another. The evidence may be weakened as to its value, but it is not categorically inadmissible.
 
 
 13
 "Defendants' challenge to Calnetics' reliance on the 1969 sales figure is in effect an in pari delicto or 'unclean hands' defense, which is not a defense in an action for treble damages." 532 F.2d at 688 (citations and footnotes omitted).
 
 
 14
 The court said that Calnetics was subject to criminal penalties and civil action for its alleged illegal activity. However, it did not lose its private antitrust action.
 
 
 15
 Like the district court, we find this reasoning compelling here. Were it not for Calnetics' allegedly illegal conduct, it would not have suffered any injury because it would not have sold any products to Volkswagen distributors. All sales were the result of commercial bribery. In effect, Calnetics claimed only an "illegal market presence" much as IBM suggests Memorex does here. The "rights" of Calnetics were no greater than those of Memorex, even assuming Memorex stole the patents from which its products were made.[3]
 
 
 16
 Memorex therefore had "rights" which could be injured by the wrongdoing of IBM. This is all that is required to maintain a private antitrust suit. Memorex's own illegal conduct did not divest it of an antitrust action. See also Semke v. Enid Automobile Dealers Association, 456 F.2d 1361 (10 Cir. 1972) (rejecting defense that plaintiff's entire business was illegal because it was unlicensed); Purex Corp. v. General Foods Corp., 318 F.Supp. 322 (C.D.Cal.1970) (recognizing asserted defense of illegality as a species of in pari delicto ).
 
 Illegality as a Defense
 
 17
 Our analysis differs from the court's in Calnetics, however. It is apparent from the many cases cited by IBM that the courts are confused as to the effect to be given an illegality defense. See, e. g., Telex Corp. v. International Business Machines, Inc., 367 F.Supp. 258, 348-55 (N.D.Okl.1973), rev'd on other grounds, 510 F.2d 894 (10 Cir.), cert. dismissed, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (misappropriation of defendant's designs may reduce damages but does not remove standing to bring an antitrust action); Mason City Tent & Awning Co. v. Clapper, 144 F.Supp. 754 (W.D.Mo.1956) (plaintiff as patent infringer could not recover full lost profits).[4]
 
 
 18
 Such confusion results from a failure to distinguish such defenses from the other equitable defenses. "Unclean hands" refers to the plaintiff's wrongdoing against a third party with respect to the subject matter of the suit. In pari delicto refers to the plaintiff's participation in the same wrongdoing as the defendant. IBM's defense refers to wrongdoing by the plaintiff against the defendant. This defense, like others of the same type, is analogous to a counterclaim, because it seeks an offset to plaintiff's damages. Thus, IBM's defense is different from either "unclean hands" or in pari delicto.
 
 
 19
 But the same considerations which led the Supreme Court to abolish these traditional equitable defenses are present here. A defendant who violates the antitrust laws has committed a public wrong. A private wrong done by a potential plaintiff should not prevent that party, who may be the only party with standing to sue, from taking action under the antitrust laws.
 
 
 20
 Accordingly, we hold that illegality is not to be recognized as a defense to an antitrust action when the illegal acts by the plaintiff are directed against the defendant.[5] A wrongful act committed against one who violates the antitrust laws must not become a shield in the violator's hands against operation of the antitrust laws. This is particularly true when the defendant has other remedies available to him.
 
 
 21
 In this case, the alleged theft by Memorex of IBM's trade secrets is not a bar to Memorex's antitrust action. IBM's proper course in this case would have been to assert a counterclaim against Memorex for the alleged misappropriation. A counterclaim would have argued for a setoff against Memorex's recovery, rather than asserting that Memorex does not have any cause of action at all. IBM chose not to assert such a claim.[6] This does not mean that IBM's violation, if any, of the antitrust laws should be immunized because of Memorex's wrongdoing.
 
 
 22
 This rule is based on important public policy grounds. As the Supreme Court stated in Perma Life, supra :
 
 
 23
 "(T)he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct." 392 U.S. at 139, 88 S.Ct. at 1984.
 
 
 24
 This court recently reaffirmed this position. In Javelin Corp. v. Uniroyal, Inc., et al., 546 F.2d 276 (9 Cir., 1976, as amended January 13, 1977), the court said that a plaintiff would be barred from recovery only when an illegal conspiracy under the Sherman Act would not have been formed but for the plaintiff's participation. The court explained:
 
 
 25
 "The 'but for' standard places a high burden of proof upon any defendant seeking to bar the plaintiff's suit on the basis of joint participation. But the plaintiff is suing not only in its own behalf, but as a 'private attorney general' representing the public interest. Congress established the private remedy to enlist the public as enforcers of the antitrust laws. The courts should encourage this function." at 279 (citations omitted).
 
 
 26
 We continue to side with the goal of vigorous enforcement of our antitrust laws.
 
 
 27
 A different result is not compelled by Bangor Punta Operations, Inc. v. Bangor & Aroostock Railroad Co., 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), upon which IBM relies. The plaintiff there had purchased all of the stock of a corporation from the defendant and was suing the prior owners for corporate mismanagement. The Court found that any injury that had been done was to the corporation itself rather than to the plaintiff. Id. at 712, 94 S.Ct. 2578. Moreover, the Court found that the plaintiff had already paid a depressed price for the stock reflecting the effects of the earlier mismanagement. Id. at 716, 94 S.Ct. 2578.
 
 
 28
 Bangor Punta, then, stands for the simple proposition that some injury must have occurred before the plaintiff can recover. See also Maltz v. Sax, 134 F.2d 2 (7 Cir.), cert. denied, 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720 (1943). IBM here does not argue that there was no injury at all, but rather that the market position which suffered injury was obtained through illegal means. The statutory requirements for suit are met. That is all that is necessary.
 
 Res Judicata
 
 29
 Memorex argues in its cross-appeal that the district court should have granted its motion to strike IBM's affirmative defense on the alternative ground that the defense was barred by res judicata.[7] It bases this contention on the 1971 dismissal with prejudice of IBM's state court action against Memorex, which contained the same allegations of theft of trade secrets as does the affirmative defense. Although we are inclined to believe that IBM was had its day in court and that res judicata therefore would apply here, Aro Corp. v. Allied Witan Co., 531 F.2d 1368 (9 Cir. 1976), we see no need to reach this issue in light of our holding that the district court correctly granted the motion to strike the affirmative defense.
 
 
 30
 IBM may not introduce evidence relating to the alleged theft of trade secrets to show the fact of such theft. However, this does not preclude IBM from introducing such evidence to show other facts. For example, Memorex has alleged in its complaint that the filing of IBM's earlier state action was an unfounded act which itself violated the antitrust laws. If Memorex presses this issue, IBM could introduce evidence defending against the claim to show that it had a good faith basis for believing that trade secrets had been stolen by Memorex.
 
 
 31
 The same result would be reached even if we were to hold that res judicata applies. It is well established that although an issue was litigated and a finding made on that issue in prior litigation, the prior judgment will not foreclose reconsideration of that issue if the issue was not necessary to the rendering of the prior judgment, and hence was incidental, collateral, or immaterial to that judgment. Norton v. Larney, 266 U.S. 511, 517, 45 S.Ct. 145, 69 L.Ed. 413 (1925); Halpern v. Schwartz, 426 F.2d 102, 105 (2 Cir. 1970). Here, the good faith of IBM in filing its state action was immaterial to the outcome of that action. It was the fact of the theft of trade secrets which was material and would have been res judicata if the action had been tried.
 
 
 32
 Of course, much of the evidence IBM would present to show it had a good faith basis for filing its state action would be the same evidence that would be used to show actual theft of trade secrets. But the facts which the evidence would attempt to prove are different. Therefore, the similarity of the evidence should be of no consequence as long as it is used to establish some fact other than theft of trade secrets.[8]
 
 Conclusion
 
 33
 The order of the district court striking the affirmative defense is AFFIRMED.
 
 
 
 [1]
 Memorex disputes IBM's allegation of theft of any type in this case, suggesting that the switch by some IBM personnel was natural in light of the "higher potential for growth and advancement" with Memorex. However, for purposes of review of this order to strike, we accept IBM's allegations as true. See In re Western Liquid Asphalt Cases, 487 F.2d 191, 194 (9 Cir. 1973), cert. denied, 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974)
 
 
 [2]
 Santa Clara County, Action No. 247541
 
 
 [3]
 Memorex, like Calnetics, was subject to civil action and even criminal penalties for its wrongdoing. IBM in fact pursued its civil remedy against Memorex, but settled that case
 
 
 [4]
 To the extent the holdings of these cases are inconsistent with this opinion, they are disapproved
 
 
 [5]
 This does not mean that any violation of a law by a plaintiff will not bar an action. If, for example, a plaintiff participates in an illegal conspiracy to restrain trade an act not directed against the defendant then his conduct must be evaluated under different standards. What we are holding today is that wrongs against the defendant, such as the theft of trade secrets, will not bar the plaintiff's antitrust action
 
 
 [6]
 Because of its prior state action, IBM's counterclaim might have been barred by res judicata. This may be the reason why it chose to assert an affirmative defense instead. See discussion of res judicata infra
 
 
 [7]
 We assume that this second question was properly certified since both parties so concede. Long and intricate arguments have been submitted on this issue. Our discussion here is not meant to judge the merits of those arguments, but rather to give the district court some guidance on this difficult point of law as it continues with this litigation
 
 
 [8]
 IBM may also use this evidence for purposes of impeachment. Again, the evidence would not show theft of trade secrets but rather that a witness may not be telling the truth. However, it seems clear that IBM may not use this evidence to reduce damages. Such use would be to show the fact of the theft itself. Moreover, damages go to the extent of the antitrust injury an important element in the cause of action itself. Cf. Mead v. Retail Clerk's International Ass'n, 523 F.2d 1371 (9 Cir. 1975). Therefore, use of this evidence to reduce damages would be equivalent to its use as an affirmative defense. Our holding that illegality is not to be recognized as a defense to an antitrust action when the illegal acts by the plaintiffs are directed against the defendant bars the use of this evidence in this context
 There may be other situations which we do not list or foresee in which the use of some of the evidence relating to theft of trade secrets would still be permitted. We decline to speculate on what these may be, but emphasize that any such use will be minimal.